IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONDI SHUEY,**<br>**Plaintiff**<br><br>**v.**<br><br>**GEISINGER HEALTH SYSTEM,**<br>**Defendant** | :<br>:<br>:<br>:<br>:<br>:<br>: | **No. 4:23cv1400**<br><br>**(Judge Munley)** |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Rondi Shuey has worked for Defendant Geisinger Health System ("Geisinger") for over 40 years at its flagship hospital. From 2009 to 2021, Shuey was a Pre-Op Charge Nurse with a Clinical Enhancement Program ("CEP") designation within the same-day surgery unit. In May 2021, Geisinger posted the plaintiff's position and filled that role with someone much younger. Shuey believes this employment decision broke the law. In this action, she advances age discrimination and retaliation claims against her employer under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951–963.[1]

Before the court is a motion for summary judgment filed by Geisinger. Among its various arguments, Geisinger asserts that Shuey sued the wrong

[1] The court has subject matter jurisdiction under 28 U.S.C. § 1331 based on plaintiff's ADEA claims and supplemental jurisdiction over the plaintiff's PHRA claims under 28 U.S.C. § 1367(a).

entity. That issue can and should be fixed. Geisinger also highlights that the plaintiff did not apply for the position even though she was able to do so. As discussed below, however, plaintiff has explanations for her decision not to reapply among other evidence that a reasonable jury may rely upon to find age discrimination. The court must deny the motion in that respect. But the plaintiff does not have evidence to move forward to trial on her retaliation claims, so judgment in Geisinger's favor is appropriate on that portion of the case.

**Background**[2]

In March 1979, a week or two after graduating from Penn State with a degree in nursing, Shuey started working for Geisinger Medical Center in Danville, Pennsylvania. (Doc. 35-3 at ECF p. 1; Doc. 43-3, Pl. Dep., 20:2-22, 21:11-23). She became a registered nurse that same year. (Doc. 43-3, Pl. Dep. 22:6-12). In 1981, she moved into the adult intensive care unit, and, in 1983 or 1984, she transferred into the postoperative care unit. Id., 23:6-10, 26:10-12. In August 1986, Geisinger hired plaintiff for a nursing position in the same-day surgery unit. Id., 27:21–28:1. She still works in that unit as an RN. Id., 29:9-11, 37:5-8.

[2] The court refers to the evidence in the summary judgment record in the light most favorable to the plaintiff. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).

This case is about Shuey's role as Pre-Op Charge Nurse/CEP in that unit. In 2009, Geisinger hired the plaintiff for the charge nurse position. Id., 37:9-19. By that time, she had already applied for and obtained the CEP designation. Id., 38:1-12. As explained by plaintiff, a CEP designation is for a member of nursing staff who would prefer to remain at the bedside, expand their knowledge and skills, and provide education to the unit versus a management pathway. Id., 24:21–25:9, 38:15-24.

From November 2020 to February 2021, Shuey was placed in charge of a combined pre-op unit that was staffed by nurses from the PACU and same-day surgery units. (Doc. 35-3 at 2). Per plaintiff, Geisinger selected her over the PACU Pre-Op Charge Nurse because of the plaintiff's performance. Id.

In 2021, Shuey reported to Tara Leisenring, a team coordinator. (Doc. 43-3, Pl. Dep., 40:25–41:2, 42:8-16, 43:2-5). On May 13, 2021, Leisenring called plaintiff into her office. Id., 55:10–56:4. Leisenring told plaintiff that she was posting her job. Id.

Leisenring sent an email to the unit staff on May 14, 2021. (Doc. 35-3 at ECF p. 10). The email read, in relevant part:

> Hello everyone!
>
> I hope everyone enjoyed the Ice Cream this past Tuesday and Nurse's Week! I know it has been different the last 2 years but hopefully we are on a more normal trend for 2022! Thank you everyone that has stayed later, came in

earlier, or worked on a day off to help with patient care this week.

. . .

- We will be reposting the Preop Charge CEP position in the coming weeks as part of our normal rotation of Charge roles. If you are interested in this position, please email your interest and updated resume by Friday, 5/28. If you have any questions about this role, please let me know.

Id.

Per the plaintiff, the Pre-Op Charge/CEP role "never ever involved rotating staff." (Doc. 35-3 at ECF p. 2).

Geisinger calls what happened a "restructuring." (Doc. 38, Def. Br. in Supp. at ECF pp. 8, 28–30, 32, 34–35). Above Leisenring in the organizational hierarchy was an operations manager, Ryan Brown. (Doc. 35-8, R. Brown Dep. 13:2–14:8). Brown was the operations manager for perioperative services, same day surgery, PACU, and pediatric PACU. Id. Brown testified that, on his watch, five positions in those departments were posted over time: 1) the Pre-Op Charge/CEP position in same day surgery; 2) the Post-Op Charge/CEP position in same day surgery; 3) the Pre-Op Charge/CEP position in the PACU; 4) the Post-Op Charge/CEP in the PACU; and 5) a Charge Nurse/CEP position in the pediatric PACU. (Id., 17:15–18:23, 25:4–26:15, 41:12–42:16). He offered this reasoning in his deposition:

> My goal for the posting of the new positions, again changing the work, the work that was ongoing wasn't working and that's why they asked me to look for changes.
>
> So the concept was to create opportunities to get staff involved, to drive consistency, to look at metrics and data to make better informed decisions, and then ultimately we wanted to try to repost those positions to give others opportunity at work the Geisinger way for education and CEP positions in all the inpatient units throughout the system. They were supposed to be reposted opportunities.

Id., 29:20–30:12.

In line with referring to these positions as new positions, Brown further explained that it "was a concept to get more engagement in leadership . . . and hold staff accountable to move patients through the department. So it was completely different expectation of jobs." Id., 47:23–48:14. Brown referred to such changes as a "transformation," which aligned with physical changes or a different "footprint" to the departments he managed. Id., 41:12–42:16, 48:23–49:5. Additionally, Brown testified that the five posted positions were on a rotational plan like other units in the hospital, at least to his knowledge. Id., 73:20–74:11.

Two days after being advised that her job was being posted, on May 15, 2021, Shuey apologized to Leisenring in an email. (Doc. 35-3 at ECF p. 6). Leisenring responded, in part, "I appreciate your email and want you to know that this a progression of the charge role and the rotation that is involved in the

process." Id. Shuey decided not to apply for her prior position. (Doc. 43-3, Pl. Dep., 53:16–54:9).

Geisinger ultimately hired Kate Donato to fill the role previously held by plaintiff. Id., 67:11-25. Plaintiff estimated that Donato was in her late 20s at the time. Id. In the plaintiff's charge of discrimination, she asserted that Leisenring had her help with Donato's orientation and serve as a preceptor and mentor. (Doc. 35-2 at ECF p. 2). Per plaintiff, Donato only had four years of nursing experience and less than one year experience as a same-day surgery staff nurse. Id.

As for the duties of the new position, plaintiff indicates that nothing changed and that no rotation was ever implemented. (Doc. 43-3, Pl. Dep. 50:15–51:19). According to Shuey, she lost $2.40 per hour in her hourly wage when she was returned to a regular RN position. (Doc. 35-2 at ECF p. 3).

After exhausting her administrative remedies, Shuey filed a two-count complaint asserting discrimination and retaliation claims under the ADEA and PHRA. (Doc. 1). Following a period of discovery, Geisinger filed a motion for summary judgment, which is ripe for disposition.

**Standard of Review**

A movant is entitled to summary judgment "when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a

matter of law." Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R. CIV. P. 56(a). "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,'. . . [a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. All "facts in dispute," Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 187 (3d Cir. 2015), and all "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 84 (3d Cir. 1982). Furthermore, "a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)

(citation omitted). "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Id. (citations omitted).

A motion for summary judgment may also be granted where a moving party demonstrates that the nonmoving party "has not made 'a showing sufficient to establish the existence of an element essential to that party's case . . . on which that party will bear the burden of proof at trial.'" Mall Chevrolet, Inc., 99 F.4th at 630 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (emphasis removed)). After a moving party carries their burden to show the absence of a genuine, material factual dispute, Rule 56 flips the burden onto "the nonmovant to 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Daubert v. NRA Grp., LLC, 861 F.3d 382, 391 (3d Cir. 2017) (quoting Celotex Corp., 477 U.S. at 324 (emphasis removed) (alteration in original)). The non-moving party must "do more than 'simply show that there is some metaphysical doubt as to the material facts.' " Id. (quoting Matsushita, 475 U.S. at 586).

In employment discrimination cases, where intent and credibility are crucial issues, the summary judgment standard is applied with added rigor. Qin v. Vertex, Inc., 100 F.4th 458, 469 (3d Cir. 2024) (citation omitted); see also Marzano v. Comput. Sci. Corp., 91 F.3d 497, 509–10 (3d Cir. 1996)

("Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case.") (citation modified). Additionally, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion" because "[d]iscriminatory conduct is often subtle and difficult to prove." Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990) (citation modified); see also Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir. 2018) (explaining that witness testimony based on personal knowledge and directed at a material issue is sufficient to defeat summary judgment, even where it is self-serving).

**Analysis**

**I. Shuey Will Be Granted Leave to Assert Claims Against Geisinger Medical Center**

Prior to tackling the more substantive evidentiary matters, the court will address Geisinger's lead summary judgment argument, which is procedural in nature. Defendant asserts that Shuey sued Geisinger Health System, a non-entity or a defunct entity, rather than Geisinger Medical Center. (Doc. 38 at ECF p. 10–12). Shuey counters that she sued the correct defendant, indicating that the Geisinger Health System entity appeared in an administrative filing when her employer referenced the text of one of its employment policies. (Doc. 41 at ECF

pp. 37–38) (citing Doc. 43–11). Alternatively, Shuey requests "leave to amend the caption." Id. at ECF p. 38.

A passing reference to an employment policy does not controvert Geisinger's factual assertion as to the proper defendant. The court will not grant summary judgment on a technicality, however. Shuey will be provided with leave to add a defendant or correct the name of the defendant in an amended complaint.

Amendments to pleadings are governed by the Federal Rules of Civil Procedure. Rule 15 allows a party to amend a complaint upon leave of court and instructs that that leave should be freely given "when justice so requires." FED. R. CIV. P. 15(a)(2). Courts are directed to use Rule 15, like the other civil rules, "to secure the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1.

Prior to initiating this action, in September 2021, Shuey dual-filed her administrative charge with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. (Doc. 35-3, ECF p. 1). She named Geisinger Medical Center as her employer at that time. Id. She alleges that she was issued a right-to-sue letter from the EEOC on May 26, 2023. (Doc. 1, Compl., ¶ 14). For reasons unexplained by the plaintiff, she sued Geisinger Health System in this action and did not seek leave to amend to add or substitute

Geisinger Medical Center as a defendant after this issue was raised in defendant's answer and in its responses to discovery. (Doc. 5; Doc. 38 at ECF p. 11).

When the administrative process concludes with a right-to-sue letter, a plaintiff has 90 days to file a federal lawsuit under the ADEA. 29 U.S.C. § 626(e). "This requirement has been treated by the courts as a statute of limitations rather than a jurisdictional prerequisite to suit." Figueroa v. Buccaneer Hotel Inc., 188 F.3d 172, 176 (3d Cir. 1999) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982)). Using May 26, 2023 as the date of receipt of the right-to-sue letter, the 90-day statutory period ended on August 24, 2023, or two days after Shuey filed this action. (Doc. 1).

To overcome this issue, Shuey must demonstrate, through Rule 15(c), that an amendment " 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 541 (2010). With respect to "relates back," Rule 15(c) specifically provides:

> **(c) Relation Back of Amendments.**
>
> ***(1) When an Amendment Relates Back.*** An amendment to a pleading relates back to the date of the original pleading when:
>
> . . .

> **(C)** the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> **(i)** received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> **(ii)** knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c).

The rule references an amendment that "changes the party or the naming of the party against whom a claim is asserted[.]" Id. The Third Circuit Court of Appeals construes this as addressing amendments for "newly added defendant[s]," Moore v. Walton, 96 F.4th 616, 623 (3d Cir. 2024), and "amendment[s] to add or substitute defendants." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004), abrogated on other grounds by Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Krupski, 560 U.S. at 541 (holding "that relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known"). Consequently, whether Shuey intends to add Geisinger Medical Center to this action or change the name of Geisinger Health System to Geisinger Medical Center, the analysis remains the same.

Under Rule 15(c)(1)(C), a plaintiff may add defendants or change the name of a party against whom claims are asserted only if:

> (1) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; and
>
> (2) within the ninety-day time period for serving a defendant after a complaint is filed provided by Rule 4(m), the party to be brought in by amendment received such notice of the action that it will not be prejudiced in defending on the merits and knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Rivera v. New Castle Cnty. Police Dep't, 152 F.4th 147, 151 (3d Cir. 2025) (citing Fed. R. Civ. P. 15(c)) (citation modified).

The rule is satisfied here. First, plaintiff has not suggested that she would add allegations or claims other than those originally alleged. Next, regarding timing, plaintiff filed a defense-supplied waiver of service on October 31, 2023, or within the 90-day period provided by Rule 4(m). (Doc. 4). As for Geisinger Medical Center's potential notice of the action as the prospective defendant, it was the named employer in administrative proceedings. Moreover, the defense counsel who waived service routinely appears before the undersigned in other matters involving Geisinger's various hospitals, clinics, and other entities. The addition of Geisinger Medical Center at this time will come as no surprise, nor will it impair Geisinger Medical Center's defenses at trial. So, the court will grant

plaintiff leave to file an amended complaint clearing up the any issue with the Geisinger defendant named in this case.

## II. Shuey's Age Discrimination Claims Must Be Resolved by a Jury

Turning to Shuey's substantive claims, the ADEA makes it unlawful for an employer to "otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). The PHRA makes it unlawful "[f]or any employer because of . . . age . . . to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required." 43 PA. STAT. § 955(a).

Geisinger takes the position that there is no analytical difference between the ADEA and PHRA. (Doc. 38, Def. Br. in Supp. at ECF p. 14 n.4). Shuey does not treat her PHRA claims as being any different from her ADEA claims. (See Doc. 41, Pl. Br. in Opp. at ECF pp. 24–37). The court will thus provide the same analysis for both statutes. See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 n.4 (3d Cir. 2015) (finding that the above-referenced provisions of the ADEA and PHRA "do not provide any indication" that the statutes should be treated differently); but see Kern v. DAS Cos., No. 24-2420, 2025 WL 2170324, at *3 (3d Cir. July 31, 2025) (noting that "some of our prior

cases might have been too quick to see overlap between the PHRA and [the ADEA].")

An age discrimination plaintiff must prove that but for her age, the employer would not have taken adverse employment action against her. Martinez v. UPMC Susquehanna, 986 F.3d 261, 265 (3d Cir. 2021) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78 (2009)); Willis, 808 F.3d at 644. At summary judgment, where a plaintiff relies on circumstantial evidence like Shuey does here, courts use the three-part burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973) to evaluate whether the plaintiff has proffered evidence to proceed to trial. Martinez, 986 F.3d at 265–66; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981). Under this precedent, a plaintiff must make out a prima facie case; the employer must offer a legitimate, nondiscriminatory explanation for its decision; and then the plaintiff must show that this explanation was a pretext for unlawful discrimination. Martinez, 986 F.3d at 265 (citing Willis, 808 F.3d at 644).

In advancing its summary judgment arguments, Geisinger challenges whether Shuey has the evidence to make out a prima facie case, touts the evidence supporting its stated reason, and is critical of the plaintiff's pretext evidence, essentially arguing that it is too thin to make a real case. (Doc. 38 at

ECF pp. 15–32). Against the record in this matter, Geisinger's methods of advocacy are really invitations for the court to weigh testimony, which it may not do. To resolve the plaintiff's claims, as discussed further below, a jury needs to see and hear all the evidence and make a collective determination as to whether Geisinger violated federal and state anti-discrimination laws in its treatment of the plaintiff.

***Prima Facie Case***

At step one of McDonnell Douglas, Shuey must make out a prima facie case. This case follows the elements of the classic age-discrimination model: 1) at least forty years old; 2) adverse employment decision; 3) qualified for the position in question; and 4) "ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." Willis, 808 F.3d at 644 (citing Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)).

Geisinger challenges whether plaintiff can prove an adverse employment action and whether plaintiff can establish that she was replaced by a younger nurse.

"The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 253. Adverse employment action "means simply that the employee suffered 'some harm' to a term or condition of employment"

and it "need not be serious[.]" Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 277 (3d Cir. 2024) (quoting Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024)); see also McCrorey v. City of Philadelphia, No. 23-2539, 2025 WL 1392164, at *3 (3d Cir. May 14, 2025) (applying Muldrow in an age-discrimination matter). Here, Shuey has evidence that she experienced an adverse employment decision. According to plaintiff, one day she was the Pre-Op Charge Nurse/CEP in the same-day surgery unit at Geisinger Danville as she had been for 12 years; the next day, her boss told her that the job would be posted. (Doc. 43-3, 37:9-19, 38:1-12, 55:10–56:4). The facts of this case meet the "some harm" standard.

As for being replaced, Shuey has that evidence also. It is not disputed that, in 2021, Geisinger hired Kate Donato as a Charge/CEP for pre-op in the same day surgery unit. Plaintiff was approximately 64 years old. Id., 18:14-17. Per plaintiff, Donato was a nurse in her late 20s. Id., 67:18-22. A nurse 30 to 35 years younger than the plaintiff is "sufficiently younger."[3]

[3] To the extent that Geisinger argues that Donato was hired to a "vastly different" position, (Doc. 38 at ECF p. 22), Shuey can also make out a prima facie case with "facts which 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Willis, 808 F.3d at 644 (3d Cir. 2015) (quoting Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)). Plaintiff disputes evidence that Shuey's position and Donato's position were "vastly different" and a determination about that fact would require a jury to weigh the credibility of the plaintiff, Tara Leisenring, Ryan Brown, and others. The best course is to consider such evidentiary details in the discussion about the plaintiff's pretext evidence.

***Legitimate, Non-Discriminatory Reason***

Geisinger has met its burden of production at step two of McDonnell Douglas through the testimony of Ryan Brown and Tara Leisenring by articulating that it posted Shuey's position due to restructuring. See Hicks, 509 U.S. at 507 (citing Burdine, 450 U.S. at 254).

***Pretext Evidence***

The real focus in addressing Geisinger's motion is whether Shuey has evidence that a reasonable jury may use to determine that Geisinger discriminated against the plaintiff based on her age. After reviewing the record, the plaintiff's age discrimination claims must go to a factfinder.

At this stage of McDonnell Douglas, plaintiff must demonstrate that the proffered reason was "not the true reason" as part of her ultimate burden of "persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. She "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a . . . determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); see also Gross, 557 U.S. at 177–78 (holding that an ADEA plaintiff must establish but-for causation). "In order to raise sufficient disbelief, the evidence must indicate 'such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." Willis, 808 F.3d at 644–45 (quoting Fuentes, 32 F.3d at 764)).

Relative to this phase of the analysis, Geisinger believes certain facts are dispositive: 1) the posted position was "vastly different" than Shuey's previous position; and 2) Shuey voluntarily did not apply for the posted position. (Doc. 38, Def. Br. in Supp. at 21).

On the first point, the asserted distinctions between the positions speaks to "restructuring," Geisinger's proffered reason for its decision. Upon review of the evidentiary record highlighted by plaintiff in opposition to summary judgment, a jury may disbelieve any asserted differences between the positions. For example, Tara Leisenring, the same-day surgery area coordinator, testified that Shuey was both a charge nurse and CEP. (Doc. 35-7, 16:19-22, 25:17–26:15, 35:4-11). Leisenring testified that Kate Donato became the "charge nurse CEP."[4] Id., 34:6-17.

Shuey described her role as requiring "daily management of staff, patient throughput, [operating room] efficiency, equipment issues, [information

---

4 Brown's testimony about Shuey's role prior to the posting conflicts with Leisenring's testimony. Brown did not believe that Shuey held the title of charge nurse and CEP at the same time. (Doc. 35-8, 27:12-15).

technology] issues, intervention with physicians, patients/family problems, intervening on patient scheduling issues when coordination of services for the day of surgery is not optimized, and overall management and coordination of the multidisciplinary teams required to provide great care and satisfaction." (Doc. 35-3 at ECF p. 2).

Ryan Brown, the operations manager, testified that, in restructuring, he "wanted to develop a concept where we could offer a CEP/charge position[.]" (Doc. 35-8, 26:16–27:11). When pressed as to whether the new position required the same skill set that Shuey described above, Brown agreed, but stated the posted position involved "looking at paths more, follow through, getting more involved with decision making and holding people accountable which was not in the original role." Id., 55:15–22. In hearing that kind of jargon, a reasonable jury could find the absence of a distinction within Brown's narrative.

Brown further testified:

> Q. Can you tell me with regard to this job posting who made the decision to post this job?
>
> A. The concept, like I said, was my idea. I had to present it to the executives because the CEP structure and title was owned by nursing education, and I wanted to try to bring the concept back.
>
> You know, clinical enhancement is what it stood for, and we wanted to use that clinical enhancement nurse not towards education, but more towards how we actively help improve throughput and efficiency

> of the bedside care as well, and try to drive consistency, and that was the concept.
>
> So I posted the positions because it was my vision.

(Id., 34:9–25).

According to plaintiff's testimony, she had been a charge nurse with a CEP designation for 12 years. (Doc. 43-3, 37:9-12, 50:15-20). Similarly, a jury may see Brown's vision as creating something that already existed.

They may also have a hard time squaring a "new position" explanation with Shuey's testimony about how the news was delivered. Per the plaintiff, Leisenring called her into her office at the end of a shift and informed the plaintiff that the hospital was posting her job. (Doc. 43-3, 56:8-12). A reasonable juror, believing Shuey, may question why Leisenring told the plaintiff that her job was going to be posted if Geisinger was really creating a new position.

Leisenring's next-day email announcement calls the "new position" explanation into further question. (Doc. 35-3 at ECF p. 10). After wishing everyone in the unit a happy Nurses' Week and mentioning the ice cream, Leisenring wrote: "We will be reposting the Preop Charge CEP position in the coming weeks as part of our normal rotation of Charge roles." Id.

Logically, new positions do not have to be reposted if they do not already exist. If a position is new and has not been rotated before, then it is not a normal rotation.[5]

To Brown and Leisenring's credit, both added nuance to the explanation through their deposition testimony, making a distinction between an "educational CEP" and a "charge CEP." (Doc. 35-8, R. Brown Dep. 26:16–27:11; Doc. 35-7, T. Leisenring Dep. 14:25–15:10, 34:9–41:16). That nuance is of no moment against the summary judgment record. Leisenring testified that Shuey was "originally in the educational CEP" and then moved "into the charge CEP, and when [Geisinger was] making the rotational change, she was in the charge CEP." (Doc. 35-7, 35:4-11).

Brown and Leisenring's explanations about "rotational change" also might make a reasonable juror's head spin with respect to any "educational CEP" and "charge CEP" distinction in this case. As noted above, Leisenring's Nurses' Week email referred to a "normal rotation of Charge roles." (Doc. 35-3 at ECF p. 10). Her deposition testimony was different. She referred to CEPs, whatever their form, as being on a two-year rotation. (Doc. 35-7, 37:13–39:12). Similarly,

---

[5] A later email from Leisenring calls the change "a progression of the charge role and the rotation that is involved in the process." (Doc. 35-3 at ECF p. 6).

Brown testified about educational CEPs rotating every two years. (Doc. 35-8, 71:15-20).

Shuey observed no rotation. Per her testimony, she held the Pre-Op Charge Nurse/CEP position for 12 years. (Doc. 43-3, 37:9-12, 50:15-20). Her successor, Kate Donato, held the position for four years and was only replaced when she planned a move to Philadelphia. Id., 67:11–68:8. With the summary judgment motion, Geisinger had an opportunity to produce a policy document, meeting notes, or even an email chain showing that a new position was going to be created with a planned rotation. Geisinger has only supplied the court with Brown and Leisenring's testimony and documents created after the fact. If a jury gives more weight to Shuey's testimony over Brown and Leisenring's testimony, they may reasonably conclude from such evidence, or lack thereof, that the rotational position never rotated at all, except when a nurse in her 60s was rotated out for a nurse in her 20s.

Geisinger also believes Shuey's failure to apply for the Charge/CEP position is fatal to her age discrimination claims. It is not. Plaintiff has evidence, if believed by a jury, that she was able and ready to apply, but her application would have been a futile gesture. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365–66 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile

gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."); Ellison v. Am. Bd. of Orthopaedic Surgery, 11 F.4th 200, 206 (3d Cir. 2021) ("A plaintiff who alleges that he has been denied a benefit or opportunity for which he did not actually apply must generally plead enough facts to show that he is able and ready to apply.") (citation modified).

Plaintiff testified:

> It was abundantly apparent by the general environment that I was working in, that Tara [Leisenring] was very interested in getting younger people involved. And I definitely didn't — got the very strong impression that I was not wanted in that role. And I was not going to subject myself to aggressive interviewing, which I had been witness to when Ryan [Brown] was interviewing other staff for positions he didn't want them in.

(Doc. 43-3, 64:10-21).

Shuey also testified about comments made by Leisenring and Brown on prior occasions. At a meeting, as plaintiff recalled, Leisenring kept saying, "younger, younger, younger" as in needing to attract younger nurses to the same day surgery unit. Id., 64:10–67:3. Lisa Creasy, a nurse in her 50s, spoke up and asked about "the people who have been here[.]" Id., 64:10–67:3, 69:21-25. Leisenring responded, "well, they'll be gone in a few years." Id. Shuey also recalled Leisenring making statements about younger staff or age on other occasions during workdays, before looking at the plaintiff and quickly correcting

herself. Id., 80:11–81:10. According to the plaintiff, Leisenring favored younger nurses when appointing people to various committees, including one occasion where Leisenring selected a younger nurse over an older nurse who was interested in the role. Id., 83:5–86:1. Additionally, at time committee meetings, Leisenring allegedly favored younger nurses in scheduling to give them work-life balance. Id., 106:20–107:14.

Shuey further testified about a different meeting where Brown stated to her, "how long have you been in this role, Rondi, over ten years? I can see how it would be difficult for you to have staff listen to you, since you have been working side by side with them for so long." Id., 88:3-23. Plaintiff asserts that Brown acted aggressively with her on one occasion when patients were not ready for surgery and another time when plaintiff went above Brown to express her concerns about the post-op charge nurse. (Doc. 35-9 at ECF pp. 2–3). On the latter occasion, plaintiff alleges that Brown made her cry. Id. at 3. In sum, plaintiff explained that she did not want to sit for an aggressive and demeaning interview with Brown after the manner in which her managers moved her out of the Charge/CEP role. Id. at 2. A jury is needed to sort through the facts and weigh credibility on the failure-to-reapply issue.

Referring back to Brown's vision to transform the departments under him and the other positions created, Geisinger asserts that the individuals who

obtained those positions were individuals in their 40s, 50s, and 60s. (Doc. 38 at ECF pp. 28–29). Those facts are also not dispositive.

It is the precedent of this circuit that "comparator employees need not be identical but must be similarly situated in 'all material respects.'" Qin, 100 F.4th at 474 (citing In re Tribune Media Co., 902 F.3d 384, 403 (3d Cir. 2018)). Moreover, "[a]n employee who holds a different job title or works in a different department is not similarly situated." Id. (quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013)).

The four positions referenced by Geisinger were not the plaintiff's position and the individuals hired did not hold the same job title. The facts about whether Kate Donato was hired to Shuey's position or a different position are disputed, but there does not appear to be a dispute that Donato was under 40 and much younger than the plaintiff. With that, Shuey has supplied sufficient evidence that a jury may disbelieve Geisinger's restructuring explanation and believe that age was more likely than not a determinative cause of Geisinger's decision. Therefore, Geisinger's motion for summary judgment will be denied with respect to Shuey's ADEA/PHRA disparate treatment age discrimination claims.

## III. Shuey Cannot Sustain ADEA/PHRA Retaliation Claims

Shuey's complaint also asserts that she experienced unlawful retaliation during her employment. (Doc. 1, ¶ 17). The ADEA makes it "unlawful for an

employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d). Similarly, the PHRA makes it unlawful "[f]or any person . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by" that statute.[6] 43 PA. STAT. § 955(d). Geisinger moves for summary judgment on these claims. Unlike Shuey's disparate treatment claim, the parties devote little attention to the facts involved in the alleged retaliation.

Nonetheless, the McDonnell Douglas framework also applies to Shuey's retaliation claims. Daniels, 776 F.3d at 193. "A plaintiff asserting a retaliation claim first must establish a prima facie case by showing (1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Id. (citation modified).

According to Shuey's opposition brief, she raised concerns with her supervisors and peers about age discrimination after her position was posted. (Doc. 41 at ECF p. 35). That is only partially accurate. According to Shuey's

---

[6] Because the parties do not contend that the ADEA and PHRA retaliation provisions are materially different, Shuey's claims are addressed in a combined analysis. Daniels, 776 F.3d at 193.

deposition testimony, other nurses came to her and told her they were sorry. (Doc. 43-3, 101:6–102:8). Plaintiff, however, did not raise any age discrimination complaint with Leisenring or Brown or Geisinger human resources. Id. 87:18–88:2. It thus appears that the only form of discernible protected activity was plaintiff's charge of discrimination with the EEOC and PHRC in September 2021. (Doc. 35-3 at ECF pp. 1–2). Per plaintiff, Leisenring retaliated by allegedly micromanaging her, orienting nursing assistants, and not backing the plaintiff up on issues with a physician or staff. (Doc. 43-3, Pl. Dep. 86:2–87:21).

In the retaliation context, "the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Daniels, 776 F.3d at 195 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). "Petty slights, minor annoyances, and simple lack of good manners generally will not suffice," id. at 196 (citation modified), but this standard is generally considered "less restrictive." Steidle v. U.S. Liab. Ins. Co., 179 F.4th 193, 206 (3d Cir. 2026).

Having reviewed the entire summary judgment record, plaintiff's deposition testimony, cited above, is the only evidence relevant to plaintiff's retaliation claims. (Doc. 43-3, Pl. Dep. 86:9-11) ("Q. . . .do you think that Geisinger

retaliated against you? A. Geisinger themselves, no. Tara, yes."). Viewing plaintiff's testimony in a light most favorable to her and applying the reasonable employee/materially adverse standard from Burlington Northern, such testimony does not meet the adverse action element of her prima facie retaliation case. Additionally, while causation may be inferred from the record when viewed as a whole, see Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007), the record in this case does not support a connection between Shuey's protected activity and the conduct attributed to Leisenring after that protected activity. Consequently, summary judgment will be granted in favor of Geisinger on the plaintiff's ADEA/PHRA retaliation claims.

**Conclusion**

For the reasons set forth above, Geisinger's motion for summary judgment will be granted with respect to Shuey's ADEA/PHRA retaliation claims. The motion will be denied regarding the plaintiff's ADEA/PHRA discrimination claims. Plaintiff will have 14 days to file an amended complaint adding or substituting Geisinger Medical Center as defendant in this case. Following the closing of the pleadings, this matter will be scheduled for a pretrial conference. An appropriate order follows.

Date: 10/6/26

JUDGE JULIA K. MUNLEY
United States District Court